**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID ROBERT SEEVER, Individually and As Co-Successor in Interest to TREVOR R. SEEVER, Deceased, and DARLENE RUIZ, Individually and as Co-Successor in Interest to TREVOR R. SEEVER, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MODESTO, MODESTO POLICE DEPARTMENT, JOSEPH LAMANTIA, and Does 1-10, inclusive,<br><br>Defendant. | Case No. 1:21-cv-01373-JLT-EPG<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS<br><br>(Doc. 28) |

David Robert Seever and Darlene Ruiz brought a 42 U.S.C. § 1983 action on behalf of their deceased son Trevor Seever, who died as a result of an officer-involved shooting. Plaintiffs' amended complaint asserts several claims against the individual officers, the City of Modesto, and the Modesto Police Department. On February 14, 2022, the City and MPD moved to dismissed two claims: Claim Four for Municipal Liability – Unconstitutional Custom, Practice, or Policy and Claim Eight – Intentional Infliction of Emotional Distress. (Doc. 28.) For the reasons set forth below, Defendants' motion to dismiss is **DENIED**.

**I.     BACKGROUND**

Plaintiffs' seek compensatory and punitive damages for injuries related to the shooting

and death of their son. (Doc. 19 at 2, ¶ 1.) At the time of his death, Trevor Seever was twenty-nine years old and lived with his mother, stepfather, and sister. (*Id.* at 2, ¶ 1, 6, ¶ 18.) The amended complaint sets forth the following allegations related to Trevor's death. On December 29, 2020, Trevor became inexplicably manic and irrational. (*Id.* at 6, ¶ 18.) Trevor had no history of violence but informed his family that he intended to buy a firearm. (*Id.*) Trevor called his mother to tell her that he was coming over to their house, that they needed to leave, and to call 911. (*Id.*) His sister called 911 and informed the operator of the situation. (*Id.*)

After receiving the information from dispatch, MPD officer Joseph Lamantia arrived first at the church where they believed Trevor to be going. (Doc. 19 at 6, ¶ 20.) Other MPD officers arrived later. (*Id.*) Lamantia's body camera recorded the incident that occurred at the church.[1] (*Id.* at 6, ¶ 21.) When Lamantia first exited his vehicle, Trevor was running away from him, and Lamantaia told him to "Get on the ground." (*Id.* 7, ¶ 22.) Lamantia then fired four shots within approximately two seconds, without first providing a warning or waiting for Trevor to comply with the command. (*Id.*) Lamantia ran closer to Trevor yelling, "Show me your hands" and "Put your hands up." (*Id.* at 7, ¶ 23.) Camera footage shows Trevor complied. (*Id.*) Lamantia then fired three more shots. (*Id.* at 8, ¶ 24.) Trevor cried out, "I can't breathe" and dropped to the ground. (*Id.* at 8, ¶ 25.)

Following the shooting, MPD officers had Trevor transported to the hospital. (Doc. 19 at 8, ¶ 26.) Due to the loss of blood, Trevor exsanguinated and was pronounced dead in the emergency room shortly after arrival. (*Id.*) Trevor's mother, Ms. Ruiz, had arrived at the church prior to Trevor being transported, and MPD officers assured her that Trevor would be "ok." (*Id.* at 27-28, ¶ 83.) Officers told Ms. Ruiz to return home and wait for word of his condition. (*Id.*) Later, MPD officers interviewed Ms. Ruiz and searched her home. (*Id.* at 29, ¶ 83.) After the officers completed their interview, Ms. Ruiz asked about her son's status. (*Id.* at 28, ¶ 86.) Officer Martin informed her that "He didn't make it." (*Id.*) Ms. Ruiz, individually, brings a claim for intentional infliction of emotional distress based on the officers' conduct following the shooting (Claim

---

[1] https://www.youtube.com/watch?v=ixkCfp4XL60 (released by MPD on January 13, 2021).

Eight). (*Id.* at 27-29.)

Plaintiffs' collective claims also assert liability under 42 U.S.C. § 1983 against the City and MPD for alleged unconstitutional customs, practices, or policies (Claim Four). (Doc. 19 at 16-24.) Plaintiffs allege that the MPD officers acted pursuant to these unconstitutional customs or practices when using the excessive force that caused Trevor's death (*Id.*) The amended complaint contains several prior incidents involving excessive force that demonstrate these customs or practices. For example, Defendant Lamantia, a twelve-year veteran of the MPD, had allegedly been involved in five prior police shootings. (*Id.* at 10 ¶ 30.) The amended complaint also includes twelve prior incidents of MPD officers using excessive force, all of which resulted in a significant settlement payment to the victim or a pending litigation. (*Id.* at 18-23.) The City and MPD Defendants contend that Plaintiffs failed to sufficiently plead Claim Four and Claim Eight and seek dismissal under Rule 12(b)(6) for failure to state a claim. (Doc. 28.)

## II.  LEGAL STANDARDS

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal of a claim under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Thus, under Rule 12(b)(6), "review is limited to the complaint alone." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993).

The Supreme Court held: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

3

*Iqbal*, 556 U.S. at 678 (internal citations omitted).

"The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The Court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Assoc. v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). To the extent pleading deficiencies can be cured by the plaintiff alleging additional facts, leave to amend should be granted. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

### III.   DISCUSSION

**A.   Claim Four – Municipal Liability via Unconstitutional Custom, Practice, or Policy**

Plaintiffs' fourth claim alleges that the unconstitutional actions of the Defendant Lamantia and other MPD officers were pursuant to a custom, practice, or policy directed, encouraged, allowed, or ratified by Defendants. (Doc. 19 at 16, ¶ 55.) Defendants argue that Plaintiffs' amended complaint fails to sufficiently plead that Defendants had an established unconstitutional custom, practice, or policy as to maintain *Monell* liability. (Doc. 28 at 6-9.)

   1.   Municipal Liability under *Monell*

Section 1983 permits a cause of action directly against local governments and municipalities; however, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978). Instead, § 1983 holds municipalities liable only when an "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). The challenged municipal policy must amount to "deliberate indifference" of plaintiff's constitutional

4

right and be the "moving force" behind the constitutional violation. *Mabe v. San Bernardino City., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Under *Monell* liability, a plaintiff may plead a municipal policy through several ways. First, plaintiffs may rely on an express policy—"a policy statement, ordinance, regulation, or decision officially adopted and promulgated." *Monell*, 436 U.S. at 690. Second, if no express policy exists, the plaintiff may show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (internal quotations omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Third, local governments can be liable for injuries caused by an unwritten decision by a government official, but only if that official had "final policy making authority" over "the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997). Fourth, under a similar theory of liability, if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127. Fifth, plaintiffs may raise a failure to train, discipline, or hire theory when the municipal "policymakers are on actual or constructive notice" that their omission in training, disciplining, or hiring decisions causes "employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

2. <u>Longstanding Practice or Custom</u>

Defendants' motion seeks dismissal of Plaintiffs' fourth claim which asserts *Monell* liability under the theory that Defendants had longstanding customs or practices that caused the alleged constitutional violations. (Doc. 19 at 16-24; Doc. 28 at 6-9.) Under this theory, the unwritten custom or practice must be a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well-settled as to constitute a custom or usage with the force of law.'" *Praprotnik*, 485 U.S. at 127 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970); *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) ("unwritten policy or custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled' practice" (citing *Monell*, 436 U.S. at 691)). The plaintiff must do

more than simply recite the elements of a *Monell* claim but rather must allege "sufficient allegations of underlying facts to give fair notice" to the municipal government. *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (internal quotations omitted).

A plaintiff may sufficiently plead a *Monell* custom or practice claim by showing a history of prior similar incidents which are "of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Ochoa v. City of San Jose*, 2021 WL 7627630, at *6 (N.D. Cal. Nov. 17, 2021). "Liability for improper custom may not be predicated on isolated or sporadic incidents." *Trevino*, 99 F.3d at 918. However, "[t]he line between 'isolated or sporadic incidents' and 'persistent and widespread conduct' is not clearly delineated." *Warkentine v. Soria*, 2014 WL 2093656, at *6 (E.D. Cal. May 19, 2014). At the motion to dismiss stage, courts must balance whether the municipality had sufficient notice of the repeated constitutional violations to amount to deliberate indifference (*Connick*, 563 U.S. at 61-62) with the plaintiff's limited access to details of governmental policies and training procedures prior to discovery. *Creer v. Vallejo*, 2015 WL 3795027, at *5 (E.D. Cal. June 17, 2015) (citing *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011).

To evaluate whether a sufficient pattern of unconstitutional conduct exists, courts typically consider the number of incidents, the factual similarity of those incidents, their timing, and any subsequent action by the defendant. *Turner v. City of Sacramento*, 2022 WL 1608031, at *5 (E.D. Cal. May 20, 2022). The prior incidents of constitutional violations need not be identical to the factual circumstances giving rise to the plaintiff's claims, but they must be "substantially similar in character." *See Weaver v. City of Stockton*, 2020 WL 5763763, at *8 (E.D. Cal. Sept. 28, 2020); *but see Raudelunas v. City of Vallejo*, 2022 WL 329200, at *8 (E.D. Cal. Feb. 3, 2020). Although "[i]t is difficult to discern from the caselaw the quantum of allegations needed to survive a motion to dismiss a pattern and practice claim," *Gonzalez v. Cnty. of Merced*, 289 F. Supp. 3d 1094, 1099 (E.D. Cal. 2017), "where more than a few incidents are alleged, the determination appears to require a fully-developed factual record." *Lemus v. County of Merced*, 2016 WL 2930523, at *4 (E.D. Cal. May 19, 2016), aff'd, 711 Fed. App'x 859 (9th Cir. 2017).

a.      *Unconstitutional Practices Alleged by Plaintiffs*

Claim Four of the amended complaint asserts seven longstanding practices or customs which allegedly caused constitutional violations. (Doc. 19 at 16-18, ¶ 55.) Plaintiffs' list includes various unconstitutional policies of permitting, tolerating, covering up, or using deficient procedures and methods of force. (*Id.*) For example, Plaintiffs allege Defendants have a custom of allowing and using unlawful deadly force when faced with a less than an immediate threat of death to officers; using deadly force as a first resort; and failing to give proper warnings before using deadly force. (*Id.*) Plaintiffs also allege Defendants have a practice of covering up or improperly investigating complaints of officer misconduct or unlawful police activity. (*Id.*) Plaintiffs' list of unconstitutional customs further includes allegations that Defendants failed to properly train its officers on the use of force and reasonable de-escalation techniques. (*Id.*) Defendants did not challenge the specificity with which Plaintiffs articulated the unconstitutional practices or customs, and the Court finds Plaintiffs sufficiently identified the unconstitutional practices or customs. *Mateos-Sandoval v. Cnty. of Sonoma*, 942 F. Supp. 2d 890, 900 (N.D. Cal. 2013) (finding plaintiff sufficiently pled the challenged customs or practice because they "specify the content of the policies, customs, or practice the execution of which gave rise to Plaintiffs' constitutional injuries").

b.      *Factual Similarity of Prior Incidents*

In their amended complaint, Plaintiffs included twelve prior incidents of excessive force used by MPD officers as evidence of the alleged longstanding customs and practices. (Doc. 19 at 18-23, ¶ 57-58.) Each of these incidents resulted in either a significant settlement payout to the victim or victim's successors or a currently pending lawsuit. (*Id.*) The incidents range from 2009 to 2017 with four of the incidents occurring within the five years prior to the events giving rise to Plaintiffs' claims.[2] (*Id.*) Five of the incidents involved police officers discharging a lethal

---

[2] Although Defendants do not appear to challenge the timeliness of the prior incidents, the Court notes that their consistency from 2009 to 2017, with at least one incident leading to litigation or settlement each year except for 2012, indicates the permanence of the alleged unconstitutional customs. *See Estate of Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1209 (2019) ("Agedness alone is not problematic, so long as the aged cases fall into a pattern of sufficient duration, frequency, and consistency.").

7

1 weapon; two resulted in the death of the victim; two involved Defendant Lamantia; and three
2 cases involved a victim undergoing a mental health crisis. (*Id.*)

3       Defendants argue these excessive force incidents are not sufficiently similar to the
4 circumstances giving rise to Plaintiffs' claims. (Doc. 28 at 7-8.) Defendants contend that only five
5 of the prior incidents involved an officer using lethal force, and the remaining seven are too
6 dissimilar because they "do not involve lethal force with a firearm." (*Id.* at 7.) Defendants further
7 argue that the five incidents with lethal force "do not exemplify the specifically-alleged
8 shortcomings" articulated in the amended complaint. (*Id.* at 8.)

9       Plaintiffs, however, are not required at the pleading stage to supply a list of prior incidents
10 which closely match the exact fact pattern that caused Trevor's injuries and death. *See J.M. v.*
11 *County of Stanislaus*, 2018 WL 5879725, at *5 (E.D. Cal. Nov. 7, 2018). Rather, the correct
12 analysis focuses on the similarity between the "factually pertinent" aspects of the prior incidents.
13 *McCoy v. City of Vallejo*, 2020 WL 374356, at * 4 (E.D. Cal. Jan. 23, 2020). For instance, the
14 degree or type of force used by officers should be relatively similar. *Compare id.* (finding
15 sufficient allegations for *Monell* liability because six of the twenty-one incidents in the complaint
16 involved "deadly officer shootings," as did the plaintiff's alleged incident, even though none of
17 the prior incidents involved the same number of officers or interactions with the plaintiff in a
18 similar location); *with Raudelunas*, 2022 WL 329200, at *8 (E.D. Cal. Feb. 3, 2022) (granting
19 dismissal of claims relying on twenty-one incidents of excessive force because none of them
20 involved the victim being tased and handcuffed, as the plaintiff had).

21       At least five of Plaintiffs' alleged prior incidents have sufficient factual similarity to the
22 circumstances leading to Trevor's death. (Doc. 19 at 18-23, ¶ 57-58.) MPD officers discharged
23 lethal weapons on individuals in each of these five incidents, using the same type of force as
24 Lamantia who shot Trevor with his police-issued firearm. (*Id.*) In a sixth incident, the officers
25 discharged a shotgun with less-than lethal rounds that nonetheless resulted in the plaintiff's death.
26 (*Id.*) At least two of the incidents where a lethal weapon was discharged involved an unarmed
27 victim, which further parallels the allegations that Lamantia did not first attempt to determine if
28 Trevor had a weapon and Trevor was in fact unarmed. (*Id.*; Doc. 19 at 9, ¶ 27.) Moreover, three

of the twelve incidents involved a victim suffering from a mental health crisis, as was Trevor at the time his family called 911 and when he was shot. (Doc. 19 at 18-23, ¶ 57-58; Doc. 19 at 6, ¶ 19.) Although the prior instances do not contain an exact parallel to all factual circumstances surrounding Trevor's death (i.e., a twenty-nine-year-old running away from police at a church after the family called 911 to report his mental health crisis), the Court finds the same pertinent factual details occurred in a significant number of the prior incidents.

In addition, a prior incident involving the same named defendant further indicates a sufficiently pled *Monell* claim. *Weaver*, 2020 WL 5763763, at *7 (finding a sufficiently pled unconstitutional custom or practice claim based on fifteen incidents of excessive force and one which involved the same defendant). Two of the twelve excessive force cases in Plaintiffs' amended complaint involved Defendant Lamantia. In 2016, Lamantia and other responding officers used tasers and less-lethal shotgun rounds to subdue a man suffering from mental illness and shot the victim while he was lying on the ground. (Doc. 19 at 18-19, ¶ 57(a).) The victim died after his arrest. (*Id.*) Also in 2016, Lamantia and two other officers confronted a woman who had threatened suicide and been drinking. (Doc. 19 at 22-23, ¶ 58(a).) The woman had a kitchen knife in her hands, but after an initial show of force, she began walking away from the officers, who then discharged their weapons, resulting in her death. (*Id.*) Both incidents occurred within approximately two years prior to Trevor's death, which likewise resulted from Lamantia discharging his firearm, and though Trevor was suffering a mental health crisis, he was unarmed, and did not resist law enforcement. (Doc. 19 at 6-8, ¶¶ 19, 27.) The pertinent factual details of the cases in which Lamantia used of excessive force further demonstrates the sufficiency of Plaintiffs' allegations.

Defendants cite to *Estate of Mendez v. City of Ceres*, to suggest that a more extensive factual inquiry is necessary when comparing the prior incidents. 390 F. Supp. 3d 1189, 1209 (E.D. Cal. 2019); (Doc. 28 at 8.) However, in *Mendez*, the court only evaluated five of the ten alleged incidents because a substantial temporal gap that separated the other five. *Mendez*, 390 F. Supp. 3d at 1210. Of those five, only three concerned officer-involved shootings, which the court found to be too few to evidence a widespread custom. *Id.* In comparison, Plaintiffs' complaint

contains five instances of a lethal weapon discharged, an additional case where the victim died from non-lethal rounds, and two cases that involved the same defendant in the complaint, which creates a stronger factual connection to Trevor's case. *See McCoy*, 2020 WL 374356, at * 4.

Several courts have required even less factual similarity among the prior incidents and simply accepted a significant history of cases that generally involved excessive force because "[w]hether these previous cases are all manifestations of the same policy or custom . . . are factual issues to be determined" after discovery. *Estate of Osuana v. County of Stanislaus*, 392 F. Supp. 3d 1162, 1173 (E.D. Cal. 2019) (holding "numerous prior cases" where defendants were found liable or paid substantial settlements and "appear to involve the allegations of excessive use of force" satisfied the pleading standard despite factual differences in the type of force used); *see also Creer*, 2015 WL 3795027, at 5-6 (finding eight prior instances of excessive force were sufficient to plead a custom or practice claim without comparing the specific factual circumstances of those incidents). Under this lower standard, all twelve instances of excessive force would demonstrate a widespread and persistent pattern of using unconstitutional force.

Defendants argue that Plaintiffs may not rely on these prior instances of excessive force because they are "third-party allegations" and "third-party lawsuits" with no "verdicts or findings of facts." (Doc. 38 at 3-4.) Defendants provide no authority to support their argument. Courts of this district regularly allow plaintiffs to rely on similar prior incidents that resulted in substantial settlements or in ongoing litigation to evidence a practice or custom claim. *McClellan v. City of Sacramento*, 2021 WL 1164487, at *3 (E.D. Cal. Mar. 25, 2021) ("Evidence of a city's settlement in an earlier police brutality action may be admitted to show the city is aware of wrongful conduct by its officers."); *see also Estate of Alejandro Sanchez v. Cnty. of Stanislaus*, 2019 WL 1745868, at *1, 4 (E.D. Cal. Apr. 18, 2019) (finding sufficient prior incidents of excessive force that resulted in "large monetary settlements being reached or jury verdicts"); *see also Creer*, 2015 WL 3795027, at 5-6 (denying dismissal of *Monell* claim given the eight prior instances of excessive force that resulted in settlement or then pending litigation). Accordingly, Plaintiffs may rely on the prior settlements and pending lawsuits to plead their claim.

If proved, at least five prior incidents contain similar pertinent factual details, all twelve

incidents show a pattern of excessive force, and two incidents involved Defendant Lamantia's use of excessive force. This is a sufficient number of the substantially similar incidents to support their custom or practice claim.

                c.      *Subsequent Conduct by Defendants*

In addition to a factual similarity among the prior incidents, a municipalities' failure to take remedial action following the incidents may further support a custom or practice *Monell* claim. *See Hunter v. City of Sacramento*, 652 F.3d 1225, 1233 (9th 2011) (citing *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001) ("We have long recognized that a custom or practice can be "inferred from widespread practices or 'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'"). An unwritten, unconstitutional policy may be inferred from the municipality's conduct after an incident if the municipality takes no steps to reprimand or otherwise respond to egregious conduct. *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986). A deficient disciplinary process following a known incident of excessive force is probative of an established policy of allowing police officers to "get away" with unconstitutional conduct. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015) (holding evidence of prior complaints of excessive force was relevant to show that the city was aware of the police officer's pattern of excessive force where it had taken no disciplinary action to curb the officer's propensity).

In the amended complaint, Plaintiffs allege that Defendants allowed officers, such as Lamantia, who had a pattern of using unreasonable force to continue on patrol without corrective training or discipline. (Doc. 19 at 16-18, ¶ 55.) Plaintiffs also assert that Defendants had a practice of "[c]overing up or tolerating violations of constitutional rights." (*Id.*) Plaintiffs argue that the failure to discipline Lamantia, despite his involvement in four fatal shootings during his career, also evidences Defendants' awareness of his "violent tendencies" and their refusal to remediate his conduct. (Doc. 31 at 23-25; Doc. 19 at 10, ¶ 30.)

In reply, Defendants construe Plaintiffs' argument as a separate ratification theory of *Monell* liability. Defendants cite to *Jack v. County of Stanislaus* for the proposition that "mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983

11

1  claim." 2017 WL 4123930, at *8 (E.D. Cal. Sept. 15, 2017); (Doc. 38 at 3.) Defendants' reliance
2  on *Jack* to rebut Plaintiffs' custom or practice claim conflates two distinct bases for *Monell*
3  liability. The principals guiding the ratification theory in *Jack* do not apply to evaluating the
4  municipalities' conduct following a pattern of constitutional violations. Under a ratification claim,
5  the analysis focuses on the municipalities' conduct following the events that gave rise to the
6  *currently* allegedly constitutional violation. *Sheehan v. City & County of San Franciso*, 743 F.3d
7  1211, 1231 (9th Cir. 2014) *rev'd on other grounds*, 575 U.S. 600 (2015) (explaining that
8  ratification is the approval of a subordinate's decision and involves a "deliberate choice to
9  endorse" the subordinate's actions); *see also Jack*, 2017 WL 4123930, at *8 ("[A] mere failure to
10 discipline does not amount to ratification."). On the other hand, a municipality's failure to
11 discipline a pattern of *prior* constitutional violations bears on whether an established custom or
12 practice of constitutional violations exists.[3]

13 Plaintiffs do not rely on the failure to discipline as a separate ratification theory but rather
14 as additional evidence of a widespread custom or practice. Plaintiffs' allegations that Defendants
15 failed to discipline Lamantia and other MPD officers after using excessive force in incidents prior
16 to Trevor's death relate to a permitted custom or practice of unconstitutional force, particularly
17 deadly force. Plaintiffs' allegations do not concern Defendants' actions or inactions after
18 Lamantia shot Trevor, the event which gives rise to Plaintiffs' current claims. Taking as true the
19 allegations that Defendant Lamantia had been involved in four prior fatal shootings without any
20 reprimand or discipline, Defendants' subsequent conduct in failing to take remedial action further
21 supports Plaintiffs' custom or practice claim for *Monell* liability.[4]

22 **B.     Claim Eight - Intentional Infliction of Emotional Distress**

23

---

[3] In their initial motion, Defendants also refer to a "toleration" theory, likewise citing to *Jack* to argue that the failure to overrule a subordinate's actions cannot satisfy the pleading standard. (Doc. 28 at 7.) Defendants appear to interpret Plaintiffs' claim as a ratification theory rather than the custom and practice basis of liability explained above.
[4] Defendants argue that the allegations regarding discipline and training should also fail to state a claim because Plaintiffs' have not connected these practices or customs to the specific incidents of excessive force. (Doc. 28 at 8.) However, the amended complaint expressly alleges that in each of the cases of prior excessive force, "no disciplinary action was taken against any of the offending officers, and their opportunities for continued employment, and even promotions were not affected." (Doc. 19 at 21, ¶ 57.) Accordingly, Defendants' failure to take remedial action in these instances also supports a widespread unconstitutional custom or practice.

Defendants also seek to dismiss Ms. Ruiz's claim for intentional infliction of emotional distress arising from her interactions with the MPD officers following the shooting of her son. (Doc. 28 at 9-11.) Ms. Ruiz alleges that MPD officers mislead her about Trevor's condition, deliberately withheld the news of his death to facilitate their investigation and misinformed her about Trevor's remains. (Doc. 19 at 27-28.) Ms. Ruiz contends their outrageous conduct exacerbated her grief and emotional distress. (*Id.*) Defendants argue they are immune from liability under California Government Code §§ 815.2 and 821.6, and Ms. Ruiz failed to sufficiently plead Claim Eight. (Doc. 28 at 9-11.)

1. <u>Immunity under California Government Code §§ 815.2 and 821.6</u>

Defendants claim immunity from Ms. Ruiz' claim for IIED under California Government Code §§ 815.2 and 821.6. (Doc. 28 at 9-10.) Section 815.2(b) shields public entities from liability for "injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Under § 821.6, a public employee is not liable for injuries caused by "instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Accordingly, whether Defendants have immunity depends on whether the immunity under § 821.6 applies to the MPD officers' actions that give rise to Ms. Ruiz's IIED claim. The parties dispute the scope of § 821.6 immunity as applied by California courts and the Ninth Circuit. Plaintiffs argue the immunity applies only to malicious prosecution claims. (Doc. 31 at 30-31.) On the other hand, Defendants contend that the immunity applies more broadly and covers officers' tortious actions taken during investigations as part of judicial and administrative proceedings. (Doc. 28 at 9.)

In *Sullivan v. City of Los Angeles*, 12 Cal.3d. 710 (1974), the California Supreme Court noted that § 821.6 immunity applies claims of malicious prosecution. (*Id*. at 719 [holding § 821.6 immunity does not apply for false imprisonment claims because "the history of section 821.6 demonstrates that the Legislature intended the section to protect public employees from liability only for *malicious prosecution*."]) (emphasis in original). Subsequently, California courts of appeal have extended the immunity's coverage to include other tortious claims, such as IIED and negligence. *See, e.g.*, *Amylou R. v. Cnty. of Riverside*, 28 Cal.App.4th 1205, 1209-14 (1994);

13

*Leon v. Cnty. of Riverside*, 64 Cal. App. 5th 837, 846-49 (2021); *Baughman v. State of California*, 38 Cal.App.4th 182, 191-193 (1995). The appeals courts expanded the immunity to include "actions taken in preparation for formal proceedings," such as police investigations of crimes in advance of the institution of a judicial action. *Amylou* at 1209-10 (holding police investigations are "an essential step toward the institution of formal proceedings" and therefore "cloaked with immunity") (internal quotations omitted). The California Supreme Court has yet to reject or affirm the appeals courts' more expansive interpretation of § 821.6, though the California Legislature has not acted to correct the interpretation of the statute by the courts of appeal. *Leon*, 64 Cal. App. 5th at 856 (Raphael, J., concurring).

The Ninth Circuit has refused to expand § 821.6 immunity beyond the scope defined by the California Supreme Court. *Sharp v. County of Orange*, 871 F.3d 901, 920-21 (9th Cir. 2017) ("The 'prosecutorial' immunity under Cal. Gov. Code § 821.6 does not apply because it is limited to malicious-prosecution claims."); *see also Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1083 (9th Cir. 2018) (rejecting argument to extend immunity to protect officers engaged in investigations leading up to formal proceedings); *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 n.7 (9th Cir. 2021).[5] In *Sharp*, the Ninth Circuit recognized that the California appeals courts had expanded § 821.6 immunity beyond that of the California Supreme Court to include "investigative steps taken prior to a judicial proceeding." *Sharp*, 871 F.3d at 920-21. Nonetheless, the Ninth Circuit held the federal courts were "bound by the decision of the *highest* state court," not the intermediate courts. *Id.* at 921 (quoting *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991) (emphasis in original).

This Court has accepted the more expansive view of § 821.6 in *Willis v. City of Bakersfield*, 2021 WL 5054437 at *8 (E.D. Cal. Nov. 1, 2021), to some extent.[6] In *Willis*, the

---

[5] On the other hand, in *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007), the Ninth Circuit accepted that "'actions taken in preparation for formal proceedings,' including actions 'incidental to the investigation of crimes'" were encompassed in the immunity. *Id.* (*citing Amylou*, 28 Cal. App. 4th at 1209-10). However, the Court did not address the California Supreme Court's more narrow interpretation of § 821.6. Rather, this analysis was unnecessary because the facts at issue did not lend themselves to the protections of the immunity, even in its expanded form. *Id.*

[6] Notably, this Court has also rejected this position in *Wallace v. City of Fresno*, 2022 WL 2110682, at *17 (E.D. Cal. June 10, 2022) ("Because Wallace is not pursuing a state law claim for malicious prosecution, § 821.6 has no

plaintiff alleged that the officers failed to properly investigate an assault of a woman. Despite that the plaintiff had an alibi for the attack and had other corroborating evidence that he could not be the attacker, the officers built the case and the prosecutor filed charges against him. *Id*. at 1-2. The plaintiff raised many claims including claims for malicious prosecution and negligence. *Id*. The Court observed that, "the Complaint alleges that Willis gave an alibi in terms of both a witness (his travelling companion M. Hill to Delano), his cell phone's GPS, and his physical location (Delano) at the time that MM was attacked. Willis also volunteered to undergo a lie detector test, consented to a DNA swab, and maintained that neither his fingerprints nor DNA would be found on MM or at the apartment complex. Thus, Willis consistently maintained his innocence and offered what appears to be substantial evidence of innocence." *Id*. at 6. The complaint alleged further that, "BPD had decided without thoroughly investigating the facts of the case that Willis was guilty of attempting to rape MM, and refused to investigate any evidence that would exonerate Willis." *Id*. at 1.

The Court determined that the malicious prosecution claim failed due to the immunity provided by § 821.6. *Id*. at 11. The Court also determined that the negligence action—based upon the same factual premise—was also barred by § 821.6. Though this holding is not binding, it has facial appeal based upon the facts of that case. It would seem contradictory to allow immunity for the acts giving rise to the malicious prosecution claim but deny the immunity for the same acts giving rise to the negligence claim. In any event, the Court need not now make this distinction.

In this case, there is no indication in the complaint that the officers were in the process of "instituting or prosecuting any judicial or administrative proceeding" (Cal.Gov. Code 821.6) when they "mislead [the plaintiff] about [her son's] condition, deliberately withheld the news of his death to facilitate their investigation and misinformed her about Trevor's remains." Indeed, there is nothing in the complaint to suggest that a judicial or administrative proceeding was contemplated at that time. (Doc. 19 at 27-28.) Thus, the Court[7] does not find that the immunity applies and the motion on this point is **DENIED.**

---

application to this case.").
[7] Because there is no malicious prosecution claim here, this case is more akin to *Wallace* than *Willis*.

### 2. Sufficiency of Pleadings

Defendants also argue that Ms. Ruiz's IIED claim is not sufficiently pled. (Doc. 28 at 10-11.) Under California law, the elements of an IIED claim are: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct." *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996) (citing *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991). The conduct must not only be intentional and outrageous, but must also be "directed at plaintiff, or occur in the presence of a plaintiff of whom defendant is aware." *Christensen*, 54 Cal. 3d at 903. A court must make a preliminary determination as to what constitutes "extreme and outrageous conduct." *See Miller v. Nat'l Broadcasting Co.*, 187 Cal. App. 3d 1463, 1487 (1986). Generally, conduct will be found to be actionable where the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1028 (1995). The conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Berkley v. Dowds*, 152 Cal. App. 4th 518, 533 (2007) (internal quotations omitted).

As alleged in the amended complaint, MPD officers caused severe emotional distress by withholding information about the condition of Ms. Ruiz's son and providing misinformation about his remains. (Doc. 19 at 27-29.) Shortly after her son was shot, Ms. Ruiz arrived at the church, saw him loaded into an ambulance while he was still alive, and was assured by a MPD officer that he was not "critical" and would be "ok." (*Id.* at 27, ¶ 83.) The MPD officer told Ms. Ruiz to go home to await word of her son's condition. (*Id.*) Later that day, MPD officers entered Ms. Ruiz's home, searched it without permission, and interviewed Ms. Ruiz for about an hour. (*Id.* at 28, ¶ 84.) Ms. Ruiz alleges she felt assured by the officers' conduct which led her to mistakenly believe her son was not yet deceased. (*Id.*) According to Ms. Ruiz, the officers deliberately chose not to tell her that Trevor had passed, despite having been pronounced dead

about a half hour before the interview began, in order to search her house and conduct their investigation. (*Id.* at 29, ¶ 85.) After the officer completed the interview, Ms. Ruiz asked one officer for updates on her son, to which he replied, "He didn't make it." (*Id.* at 28, ¶ 86.) Ms. Ruiz then collapsed in grief. (*Id.*) In addition, MPD officers misinformed Ms. Ruiz regarding the location of her son's remains, impacting her ability to view her son. (*Id.*)

          a.    *Extreme and Outrageous Conduct*

Defendants argue the facts of the complaint do not amount to "extreme and outrageous" conduct. Defendants contend that the officers merely responded to Ms. Ruiz's questions about the condition of her son, and they did not provide "false information, nor [] actively concealed Seever's condition." (Doc. 28 at 10-11.) Though they did not cite to any authority to support their contention, Defendants argue these facts cannot constitute extreme and outrageous conduct. (*Id.*)

Conversely, Plaintiffs argue that conveying death information in a manner without sensitivity and civility or doing so with an ulterior purpose can support an IIED claim. (Doc. 31 at 29.) Plaintiffs rely on *KOVR-TV v. Superior Court*, in which the court denied summary judgment where a journalist approached minor children without a parent present, told the minors of their friends' recent murders, and videotaped the interaction for television coverage. 31 Cal. App. 4th at 1029-30. Plaintiffs also cite to *So v. Shin*, for the proposition that "[t]here is no bright line standard for judging outrageous conduct." 212 Cal. App. 4th 652, 671-72 (2013). Because the inquiry generally involves a more "intuitive than analytical" appraisal of the specific conduct in each case, "whether conduct is 'outrageous' is usually a question of fact." *Id.* at 672-73 (reversing dismissal of IIED claim against defendant doctor who argued with plaintiff following her surgery, that resulted in a miscarriage and during which she had awaken, and where the doctor showed plaintiff remains of what she believed to be her fetus).

In reply, Defendants argued *KOVR-TV* and *So* are factually distinguishable because those cases involve "conduct far beyond the bounds of decency." (Doc. 38 at 5.) Although the Court agrees the cases cited by Plaintiffs involved more severe conduct, the Court cannot say, as a matter of law, the officers' withholding the information to further their own motives of completing their investigation and interview of Ms. Ruiz do not reveal an "alarming absence of

17

sensitivity and civility." *KOVR-TV*, 31 Cal.App.4th at 1030. MPD officers made affirmative statements to Ms. Ruiz to assure her of her sons' non-critical condition and indicated they would provide status updates, while knowing that Ms. Ruiz's son had died. Their conduct supports a reasonable inference that MPD officers gave little to no regard to Ms. Ruiz's sensitivities while prioritizing their desire to have Ms. Ruiz cooperate with them during their search of the home and interview. *See Miller*, 187 Cal. App. 3d at 1487-88 (holding a jury could find defendants' conduct outrageous where a camera crew trespassed on plaintiff's residence and broadcasted her husband's last moments before his death without regard to plaintiff's protestations). Although these authorities do not precisely parallel the circumstances alleged in Ms. Ruiz claim, Defendants provided no contradictory authority for the Court to consider in opposition. Though some complaints may be so deficient as to lend themselves to a motion to dismiss, "the standard for judging outrageous conduct does not provide a 'bight line' rigidly separating that which is action from that which is not." *KOVR-TV*, 31 Cal. App. 4th at 1028. Without any supporting authority by Defendants, they fail to carry their burden that the facts alleged are legally insufficient to plead extreme and outrageous conduct.

    b. *Causation*

  Defendants further argue that Ms. Ruiz's emotional distress "is more plausibly attributed to the news of her son's death, rather than the perceived hour delay in receiving this confirmation," and thus the causation element is not met. (Doc. 28 at 11.) Ms. Ruiz argues the officers' interview and delay in informing her about her son's death at the very least exacerbated her emotional distress because they "lulled her into a false sense of security that suddenly and unexpectedly crashed after the interview." (Doc. 31 at 29.) Neither party dedicates much briefing nor provides relevant authority to support their arguments, perhaps because California courts have not, in a published opinion, sustained an attack on the legal sufficiency of a claim based upon a lack of causation. Scott D. Noble, 4 California Torts § 44.01 (2022). Causation is typically a question of fact that does not readily lend itself to a decision at the motion to dismiss stage. *State Dep't of State Hosps. v. Superior Ct.*, 61 Cal. 4th 339, 353, (2015) ("Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a

complaint . . . [unless] the facts are such that the only reasonable conclusion is an absence of causation").

On a motion to dismiss, the Court must accept the facts and reasonable inferences as alleged by Ms. Ruiz as true, and the burden remains on Defendants to show the only reasonable conclusion for the alleged facts is an absence of causation. *See Lhevan v. Spitzer*, 2021 WL 4453474, at *1 (C.D. Cal. Sep. 28, 2021); *see also Avalanche Funding, LLC v. Five Dot Cattle Co.*, 2017 WL 6040293, at *3 (denying motion to dismiss where neither party submitted sufficient arguments to support their positions because "the burden is on the defendant to prove that the plaintiff failed to state a claim"). Ms. Ruiz alleges she felt "assured by the officers speaking to her" about the incident with her son. (Doc. 18 at 28, ¶ 84.) After the officer told Ms. Ruiz of her son's death, she "collapsed in grief, shrieking with emotional anguish." (*Id.* at 28, ¶ 86.) The close proximity between the officers' actions and Ms. Ruiz's emotional anguish create a reasonable inference that the officers' conduct contributed to her emotional response. The reasonable inferences accorded to Ms. Ruiz's allegations suggest a jury could find the officers' offering assurances and withholding news of her son's death factually and proximately caused or contributed to her extreme emotional distress. Accordingly, the Court finds Defendants have not met their burden to dismiss Ms. Ruiz's IIED claim for failure to state a claim.

## IV.   ORDER

For the reasons set forth above, the Court ORDERS:

1. Defendants' motion to dismiss (Doc. 28) is **DENIED**.

IT IS SO ORDERED.

Dated:   **December 2, 2022**

UNITED STATES DISTRICT JUDGE

19